**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES ENWEREJI and | : | CIVIL ACTION |
| BERTHA ENWEREJI, | : | |
| | : | |
| v. | : | |
| | : | NO. 10-cv-4967 |
| STATE FARM FIRE AND CASUALTY CO. | : | |

**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                                 **July 28, 2011**

**I.      Introduction**

Plaintiffs James Enwereji and Bertha Enwereji ("Plaintiffs") are insurance policyholders who submitted a claim to Defendant State Farm Fire and Casualty Company ("State Farm" or "Defendant") for damages to their slate tile roof.  Defendant issued two payments to Plaintiffs to cover the cost of repairs, including replacing the damaged slate tiles.  Plaintiffs, however, claim that Defendant should pay the cost of replacing their entire roof, not merely the damaged slate tiles.  Defendant contends that it fulfilled its obligations under the insurance contract and has filed a Motion for Summary Judgment (ECF No. 16).

The legal question before the Court is a determination of Defendant's coverage obligation under the parties' insurance contract.  The Court must also evaluate whether there is evidence in the record to support a claim of bad faith under Pennsylvania law.  The Court finds that based on the undisputed facts, Defendant has fulfilled its coverage obligations and has acted in good faith.  Defendant is entitled to summary judgment as a matter of law.

**II.     Factual and Procedural History**

1

Plaintiffs held a State Farm homeowners insurance policy, Policy Number 78-PM-6166-2 ("the Policy"), effective from December 22, 2009 to December 22, 2010, for property located at 6531 N. 11th Street Philadelphia, PA 19126 ("Plaintiffs' property").  Policy, Ex. B.[1]  The Certified Renewal Certificate indicates that Plaintiffs selected the loss settlement option called "A2 Replacement Cost - Common Construction."  Certificate, Ex. B.  Section A2 of the Policy states in relevant part:

> We will pay the cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE "A" DWELLING, except for wood fences, subject to the following:
> (1) we will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction.  We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality. . .

Policy at 11.

Plaintiffs filed a claim with State Farm following the ice and snow storms that occurred on or about February 16, 2010.  Fire Claim Service Record, Ex. A at SF001.  The claim was reported to State Farm on February 26, 2010.  Id. at SF004, SF011.  On March 4, 2010, State Farm's representative Brandon Milton ("Milton")  inspected Plaintiffs' property.  Id. at SF010. Plaintiffs' representative, Daniel Monaco ("Monaco") of Certified Public Adjusters ("CPA"), was present for the inspection.[2]  Id.  Milton observed damage to the gutters, soffit, and fascia; found four slate roofing tiles on the ground; and referred the property to the "2 story steep team"

---

[1] Unless otherwise noted, Defendant filed all exhibits referenced herein with its Motion for Summary Judgment.

[2] CPA sent State Farm a memorandum dated February 24, 2010 explaining that CPA was handling Plaintiffs' claim.  Ex. N at SF107.

for further inspection of the roof.  Id.  On March 22, 2010, State Farm conducted a second

inspection of the property with Monaco present, which found damage to 79 slate roofing tiles, the

gutter, the plastic gutter guard, and the fascia.  Id. at SF009.  The following day, State Farm

issued a draft to Plaintiffs to cover "slate roof repair, gutters, soffit/fascia repair."  Id.  The draft

amount equaled the estimated replacement cost value of $7,671.76, minus depreciation and the

deductible, for a net actual cash value payment of $1,128.50.  Estimate, Ex. C.  State Farm sent a

cover letter with the statement of loss and the draft (Ex. D) to Plaintiffs on March 23, 2010.

Monaco, on behalf of Plaintiffs, sent State Farm a letter on April 5, 2010, rejecting the

offer as "totally unacceptable" and contending that the proposed "repair is neither the same like

kind or quality as what was on the property, therefore a total replacement is necessary."  Ex. E at

SF099.  Monaco also wrote that "[r]egarding the potential for Bad Faith, you are also taking an

enormous depreciation on the repairs, which as you know, no depreciation is to be taken on

minimum repairs."  Id. at SF100.  The letter requested that State Farm revise its estimate and

threatened legal action.  Id.  On April 21, 2010, Monaco sent State Farm a letter indicating that

Plaintiffs had not accepted State Farm's estimate.  Ex. H at SF091.  Monaco also sent CPA's

March 2, 2010 estimate of the damage to Plaintiffs' property as $72,844.60.  Ex. I at SF087.

Plaintiffs' estimate includes replacement of 1250 slate shingles.  Id. Ex. I at SF088.

On June 3, 2010, State Farm retained Doug Weiss ("Weiss") of Rainmasters Inc. to

inspect Plaintiffs' property a third time.  Letter, June 14, 2010, Ex. F.  Weiss found "slates

missing, cracked slates, slates out of place," as evidenced in the photographs attached to his

report, and estimated that 100 slate tiles needed replacement.  Id.  Based on Weiss's report, State

Farm prepared a revised estimate of the replacement cost value, which totaled $13,134.44, minus

3

the depreciation and deductible, for a net actual cash value payment of $5,677.23.  Ex. G at

SF156.  On August 4, 2010, State Farm issued a check for $4,548.67 to cover the amount in

excess of the first draft issued to Plaintiffs.  Ex. G.[3]

On August 6, 2010, Monaco sent a letter to State Farm stating: "We received your

supplemental estimate along with the secondary payment. . . At this time we will accept and

process this as a partial payment #1 as we continue to negotiate this claim."  Ex. J at SF080.

Plaintiffs admit that they accepted both drafts in partial payment of the claim.  Pls.' Resp. Def.'s

Mot. Summ. J. ¶ 18.

On November 19, 2010, Weiss sent a letter to State Farm, in which he evaluated

Monaco's April 5, 2010 letter and estimate.  Letter, Ex. K.  Weiss explained that the pictures he

took of the roof during his inspection revealed that the roof, originally constructed in 1920, "has

been repaired many times previously.  Some of the repairs were proper (ie. using new pieces of

slate to replace damaged pieces) and some repairs were done improperly (slate roofing sealed

with roof cement)."  Id. at 1, 2.  Weiss also wrote that it was "standard in the slate roofing

industry to remove broken, or split slate shingles and replace them with new pieces of slate," and

that his conclusions relied on the award-winning industry manuals, "Slate Bible" and "The Slate

Book."  Id.  Weiss explained that replacement tiles of  "like kind and quality" in size, thickness,

and shade are "not unusual and are standard for roofing," and available from several distributors.

Id. at 2.

On August 9, 2010, Plaintiffs filed a Complaint against Defendant in the Court of

_____

[3] The check appears to be six cents shy of what Defendant owed Plaintiffs after
subtracting the amount of the first draft ($5,677.23-$1,128.50=$4,548.73).

Common Pleas of Philadelphia County, Pennsylvania, August Term 2010, Docket No. 01212.

Compl. (Ex. A to Def.'s Notice of Removal, ECF No. 1).  The Complaint alleges breach of

contract (Count I) and bad faith in violation of 42 Pa. Cons. Stat. Ann. § 8371 (Count II).

Plaintiffs seek compensatory damages, punitive damages, attorney fees, costs, and interest.[4]

Defendant removed the case to federal court on September 23, 2010 on the basis of

diversity jurisdiction.  (ECF No. 1)  Defendant filed this Motion for Summary Judgment on April

29, 2011 and attached record evidence as exhibits.[5]  (ECF No. 16)  Plaintiffs filed their response

on May 19, 2011 and did not file any additional evidence.  (ECF No. 18)  Defendant replied on

June 9, 2011.[6]  (ECF No. 20)

### III.    The Parties' Contentions

With respect to the breach of contract claim, Defendant asserts that it complied with the

Policy.  Defendant contends that under the coverage level Plaintiffs chose ("common

construction"), Plaintiffs are entitled to the cost of repairs using materials that are "standardized

and akin to what is provided in new construction," not the cost of replacing the entire roof or the

cost of replacing obsolete, antique, or custom materials with "like kind or quality."  Def.'s Mem.

Law. 6, 8.  With respect to the bad faith claim, Defendant contends that Plaintiffs have not

---

[4]  Plaintiffs attached to the Complaint CPA's March 2, 2010 estimate of the damage (Ex. A), which is Ex. I to Defendant's Motion.

[5]  On May 2, 2011, the Court signed the parties' stipulation and order referring the case to the Federal Court Arbitration System (ECF No. 18).  However, the Court must decide the pending motion for summary judgment pursuant to Local Rule of Civil Procedure 53.2(4)(C).

[6]  Plaintiffs filed a surreply on June 14, 2011 (ECF No. 21) but did not move for leave to do so.  Pursuant to this Court's Pretrial and Trial Procedures - Civil Cases C.4., surreply briefs are not accepted without leave of the Court.

produced any evidence to meet their burden to show that Defendant lacked a reasonable basis for

denying Plaintiffs' claim for the cost of total roof replacement, and that Defendant knew or

recklessly disregarded its lack of a reasonable basis.  Id. at 9-11.

In response, Plaintiffs contend that Defendant should pay to replace the entire roof

because "there is no evidence that the slate shingles currently on the market are sufficiently

similar to those on Plaintiffs' roof to restore them to pre-loss condition."  Pls.' Mem.  Law.

Opp'n 3.  Plaintiffs argue there is a dispute of material fact as to whether repairs using materials

on the market could return Plaintiffs to their pre-loss condition.  Id. at 5.  Additionally, Plaintiffs

contend that Defendant acted in bad faith by not assessing whether "there was material on the

market that met the requirements of the policy," and by "fail[ing] to do a thorough and complete

inspection prior to making its coverage decision regarding the replacement of the entire roof."

Id. at 8.

## IV.    Standard of Review

A district court should grant a motion for summary judgment if the movant can show

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).[7]  A dispute is "genuine" if "the evidence is such that a

---

[7] Because this civil action was pending when the Amendments to the Federal Rules Of
Civil Procedure became effective on December 1, 2010, the Court references the amended
summary judgment standard in Fed. R. Civ. P. 56(a), which substitutes "genuine dispute" for
"genuine issue," the phrase in former subdivision (c).  The Rules Advisory Committee explained
that the 2010 Amendments do not affect the substantive standard for summary judgment or the
applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56 Advisory
Committee's Note.  Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court
order, the amended rule governs all proceedings commenced on or after December 1, 2010, and
all proceedings then pending, "insofar as just and practicable."  United States Courts, Rules and
Forms in Effect: Rules and Forms Amendments Effective 12/1/10,
http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.as

reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

Where the nonmoving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative."  Anderson, 477 U.S. at 249 (internal citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of the nonmovant.  Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

## V.    Discussion

### A.    Count I: Breach of Contract

Plaintiffs allege that Defendant breached its duty to pay benefits for a loss covered under the Policy.  There are no disputed material facts concerning the damage that occurred to Plaintiffs' roof in the ice and snow storms.  The legal questions before the Court are whether the Policy requires Defendant to cover 1) replacement of the entire roof, or only the damaged slate

---

px (last visited Apr. 5, 2011).

tiles, and 2) replacement tiles "sufficiently similar" to the original tiles, or standard tiles available on the market.[8]

1.      Governing Pennsylvania Law

Under Pennsylvania law, "'the interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court.'"  Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 595 (3d Cir. 2009) (quoting Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 558 (3d Cir. 2008)); see also J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004) (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)) ("As a threshold matter, '[t]he task of interpreting a contract is generally performed by a court, rather than by a jury.'").[9]  First, the district court examines "the terms of the policy which are a manifestation of the 'intent of the parties.'"  CPB Int'l, 562 F.3d at 595 (quoting Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 290 (2007)).  Second, the court "compare[s] terms of the policy to the allegations in the underlying claim."  CPB Int'l, 562 F.3d at 595.

Several principles of Pennsylvania law inform the court's reading of the policy.  "'When the language of the policy is clear and unambiguous, we must give effect to that language.'"  Id. (quoting Baumhammers, 938 A.2d at 290).  "Where critical terms are left undefined in a policy, Pennsylvania case law instructs that '[w]ords of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense. . ."  Canal Ins. Co. v. Underwriters at

---

[8] Plaintiffs conflate these questions, contending that because there are no tiles on the market that are "sufficiently similar" to the original slate tiles on the roof, "Defendant is required to replace the entire roof."  Pls.' Mem. Law Opp'n 3.

[9] The parties do not dispute that Pennsylvania law applies.

Lloyd's London, 435 F.3d 431, 435-36 (3d Cir. 2006) (quoting Madison Constr. Co. v.

Harleysville Mut. Ins. Co., 735 A.2d 100, 108 (1999)).

      "'However, when a provision in the policy is ambiguous, the policy is to be construed in

favor of the insured. . .'"  CPB Int'l, 562 F.3d at 595 (quoting Baumhammers, 938 A.2d at 290).

The determination whether a contract is ambiguous is "'a question of law.'"  Viera v. Life Ins.

Co. of N. Am., 642 F.3d 407, 419 (3d Cir. 2011) (quoting 12th St. Gym, Inc. v. Gen. Star Indem.

Co., 93 F.3d 1158, 1165 (3d Cir. 1996)).  "Under Pennsylvania law, an insurance contract is

ambiguous where it: '(1) is reasonably susceptible to different constructions, (2) is obscure in

meaning through indefiniteness of expression, or (3) has a double meaning.'"  Id. (quoting

Lawson v. Fortis Ins. Co., 301 F.3d 159, 163 (3d Cir. 2002)).  A party's unreasonable

interpretation of the contract does not create an ambiguity.  "Where there is only one reasonable

interpretation of a contract, that interpretation controls because "[s]traightforward language in an

insurance policy should be given its natural meaning."  Viera, 642 F.3d at 419-20 (quoting

Lawson, 301 F.3d at 162) (upholding the district court's appropriate interpretation of the

contract, which did not "contort" the contractual language "beyond its limits").

    **2.    "Damaged Part"**

      In this case, the loss coverage provision that Plaintiffs selected, called "A2 - Replacement

Cost Loss Settlement Common Construction," states that Defendant "will pay the cost to repair

or replace with common construction and for the same use on the premises shown in the

Declarations, the damaged part of the property."  Ex. B, Policy at 11 (emphasis added).  The

court finds that the term "damaged part" is not ambiguous.  Plaintiffs' proposed construction--

that "damaged part" refers to an entire roof rather than roofing shingles or tiles--is an

unreasonable contortion of the Policy's language.

Both parties cite <u>Greene v. United Services Automobile Association</u>, 936 A.2d 1178 (Pa. Super. Ct. 2007), a case similarly involving an insurance claim for repairs to a damaged roof, for support of their positions.  In <u>Greene,</u> as in this case, the insurance policy "clearly and unambiguously require[d] USAA to pay the replacement cost of the <u>part</u> of the building damaged." <u>Id.</u> at 1186 (emphasis added).  The insured contended that because the original shingles were no longer available on the market, the insurer was required to replace the entire roof.  <u>Id.</u>  The appellate court affirmed the trial court's holding that the insured's interpretation was "unreasonable and absurd."  <u>Id.</u> (citing Trial Ct. Op., 2/23/07, at 8) ("The trial court succinctly highlighted the absurdity of Appellants' argument when the court stated, 'To utilize [Appellants'] logic would necessitate replacing all siding when one piece of siding is damaged, or an entire door when a door knob is damaged.  It defies common sense.'").  This holding in <u>Greene</u> supports Defendant's contention that the insurer's coverage obligation for the "damaged part" of the property extends to the individual roof tiles or shingles, rather than the entire roof.

Other courts have similarly held that a homeowners' insurance policy requiring replacement of a damaged part of the property "obligates [the insurer] to pay only for the damaged portion of the roof and the replacement of shingles in that area; it is not obligated to pay to replace the entire roof."  <u>Padgett v. State Farm Fire & Cas. Co.</u>, 714 So.2d 302, 305 (Ala. Civ. App. 1997) (citing <u>Graffeo v. State Farm Fire & Cas., Inc.</u>, 628 So.2d 790 (Ala. Civ. App. 1993)) (insurer's payment of cost to repair the damaged shingles satisfied its coverage obligation under the policy); <u>see also</u> <u>Popich v. Fid.& Deposit Co. of Md.</u>, 231 So.2d 604, 609 (La. App. Ct. 1970), <u>judgment amended by</u>, 245 So.2d 394 (La. 1971) (where individual shingles were

damaged, the plaintiffs' expert's "recommendation of a completely new roof is entirely
unreasonable").  Furthermore, the purpose of an insurance contract--restoring the insureds to
their pre-loss condition--suggests that the insured should not receive a windfall:  "Since
insurance policies are based on principles of indemnity rather than enrichment, claimants should
not be permitted to exploit their losses and use them as an opportunity to remodel their homes at
the insurer's expense."  Burton v. Republic Ins. Co., 845 A.2d 889, 896 (Pa. Super. Ct. 2004)
(citing Ins. Co. of N. Am. v. Alberstadt, 119 A.2d 83 (1956)).

  Here, comparing the Policy language to the allegations, the Court finds that the Defendant
has a coverage obligation for repair or replacement of the "damaged part" of the property, i.e. the
individual tiles that are cracked, missing, or askew.  The Rainmasters, Inc. report on which State
Farm relied for its final calculation of the repair costs estimated that 100 tiles need replacement,
and the attached photographs show a generally intact roof with some damaged tiles.  Ex. F.  The
report prepared by CPA on behalf of Plaintiffs indicated that the roof has 1250 tiles.  Ex. I at
SF088.  Therefore, more than 90% of Plaintiffs' roof is intact.  Requiring Defendant to pay for an
entirely new roof would be a windfall for Plaintiffs and contrary to the public policy rationale for
insurance contracts.

  **3. "Common Construction"**

  With respect to permissible replacement materials, the "Common Construction" coverage
option that Plaintiffs selected provides that Defendant "will pay only for repair or replacement of
the damaged part of the property  with common construction techniques and materials commonly
used by the building trades in standard new construction."  Ex. B, Policy at 11.  Defendant "will
not pay the cost to repair or replace obsolete, antique or custom construction with like kind and

quality." Id. The alternative coverage option that Plaintiffs did not select, called "A1 Replacement Cost - Similar Construction," provides for the cost of repairs or replacement with "similar construction." Id. The "similar construction" option does not exclude replacement of obsolete, antique, or custom items with materials of like kind and quality.

The parties again rely on Greene, discussed above, in which the insurance policy "clearly and unambiguously provide[d] for 'like construction,' not replacement with the identical item damaged." Greene, 936 A.2d at 1186. The Greene court held that the insurer met its coverage obligation by paying for replacement shingles "similar to the damaged shingles in function, color, and shape. . . [and] did not require USAA to pay for the replacement of Appellants' entire roof." Id. at 1186-87 (affirming the denial of judgment notwithstanding the verdict for plaintiffs following a nonjury trial). Greene is distinguishable because the Policy here requires "common construction" and expressly excludes coverage for like construction. Greene does not, as Plaintiffs contend, mandate that Defendant pay for materials "sufficiently similar to the materials on Plaintiffs' home," regardless of an insurance contract's terms. Pls.' Mem. Law Opp'n 4. However, as Defendant asserts, the Greene court's conclusion that replacement of the damaged shingles rather than total roof replacement was sufficient, despite the "higher" level of coverage, is applicable to this case.

The parties also discuss another case involving claims for a damaged roof, Collins v. Allstate Insurance Co., No. 2:09-cv-01824-WY, 2009 WL 4729901 (E.D. Pa. Dec. 10, 2009) (Yohn, J.) ("Collins I"). The insurance contract in Collins I, like the contract in Greene and unlike the Policy here, called for replacing damaged parts with materials of "like kind and quality" or "equivalent construction for similar use." Id. at *1. In Collins I, Allstate moved for

12

summary judgment on the insured's claim for replacement of the entire roof.  Id.  The insured

filed a supporting affidavit from its public adjuster, which stated that no slate tiles of "like kind

and quality" or "equivalent construction" were available on the market.  Id. at *6.  Judge Yohn

found that the affidavit raised a genuine issue of material fact preventing summary judgment.  Id.

     Collins is distinguishable because the availability of materials of like kind and quality is

not a relevant material fact in this case.  Under the Policy here, Plaintiffs may be reimbursed for

"materials commonly used by the building trades in standard new construction."  Ex. B, Policy at

11.  There is no dispute that such materials are available.  Defendant submitted as evidence a

report from Rainmasters, Inc. discussing the availability of tiles resembling the damaged slate

tiles in size, thickness, and color, which are sold by several distributors and are "not unusual and

are standard for roofing."  Ex. K at 2.  Plaintiffs have not submitted any evidence to show a

dispute of fact as to the availability of "common construction" materials.

     Moreover, Plaintiffs' argument that the damaged slate tiles dating from the 1920s must be

replaced with "sufficiently similar" tiles is directly contradicted by the Policy's terms, which

exclude coverage of "like" replacements for antique and custom items.  Had Plaintiffs selected

the "similar construction" coverage provision, their argument that they are entitled to

replacement slate tiles of "like kind and quality" would be more compelling, but that is not the

policy Plaintiffs chose.[10]

     "[A]n action for breach of an insurance contract does not lie when the policy proceeds

_____

[10] There are few court cases contrasting "similar construction" and "common construction" homeowner insurance policies.  However, at least one other court has noted that "'[s]imilar construction' coverage is more favorable to the insured than 'common construction' coverage."  Wickman v. State Farm Fire & Cas. Co., 616 F. Supp. 2d 909, 912 (E.D. Wis. 2009) (Griesbach, J.).

have been paid." Tangle v. State Farm Ins. Cos., No. 08-112, 2010 WL 3420661, at *7 (W.D.

Pa. Aug. 4, 2010) (Baxter, M.J.), adopted by, 2010 WL 3420657 (W.D. Pa. Aug. 30, 2010)

(quoting Oehlmann v. Metro. Life Ins. Co., 644 F. Supp. 2d 521, 533 (M.D. Pa. 2007) (Kosik,

J.)).  Before this case was filed, Defendant issued two checks to Plaintiffs for the cost of

replacing the damaged portion of the roof with common construction materials.  Defendant has

satisfied its coverage obligation under the Policy.  The Court grants summary judgment to

Defendant on Count I.

> **B.**     **Count II: Bad Faith**

Plaintiffs also allege that Defendant acted in bad faith by treating Plaintiffs "with reckless

indifference and disregard," "refusing to pay Plaintiffs' claim without conducting a reasonable

and fair investigation based upon all available information," paying a sum "drastically below" the

cost of the loss, and "acting in an obstructive, deceitful and dilatory manner."  Compl. ¶ 13.

Under the bad faith statute, "if the court finds that the insurer has acted in bad faith

toward the insured," it may: "(1) Award interest on the amount of the claim from the date the

claim was made by the insured in an amount equal to the prime rate of interest plus 3%.  (2)

Award punitive damages against the insurer.  (3) Assess court costs and attorney fees against the

insurer."  42 Pa. Cons. Stat. Ann. § 8371.  The statute does not define "bad faith."  The Third

Circuit has "predicted that the Pennsylvania Supreme Court would define the term according to

the definition set forth by the Pennsylvania Superior Court in Terletsky v. Prudential Property

and Casualty Insurance Company, 649 A.2d 680 (Pa. Super. Ct. 1984)."  Northwestern Mut. Life

Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).  Terletsky defined "bad faith" as follows:

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay

proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Terletsky, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed.1990)).

The insured has the burden of proof to establish: "(1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." Babayan, 430 F.3d at 137 (citing Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)).  The insured must prove bad faith "by clear and convincing evidence," not insinuations. Terletsky, 649 A.2d at 688 (citations omitted). See, e.g., Collins v. Allstate Ins. Co., No. 2:09-cv-01824-WY, 2010 WL 2510376, at *6 (E.D. Pa. June 17, 2010) (Yohn, J.) ("Collins II") (granting summary judgment to the insurer on the bad faith claim where the insured failed to provide clear and convincing evidence that the insurer's decision to cover repairing damaged roof tiles, rather than replacing the entire roof, lacked a reasonable basis, was frivolous, unfounded, reckless, or motivated by ill will); Greene, 936 A.2d at 1187-89 (affirming insurer did not show bad faith by failing to respond to a letter, not returning a few phone calls, and taking eight months to issue a coverage check, because there was no evidence that the insurer had a "motive of self-interest or ill will" against the insured); Zimmerman v. Harleysville Mut. Ins. Co., 860 A.2d 167, 174 (Pa. Super. Ct. 2004) (affirming award of punitive damages on a bad faith claim where the evidence showed the insurer was "slacking off" and the insurer made spurious claims that the insured knew about preexisting conditions).

Conducting a thorough investigation of a claim demonstrates the insurer's reasonable

15

behavior.  For example, in <u>Bostick v. ITT Hartford Group, Inc.</u>, 56 F. Supp. 2d 580 (E.D.Pa. 1999) (Reed, J.), the plaintiff homeowners alleged that their insurer acted in bad faith by denying coverage for a collapsed wall.  <u>Id.</u> at 587.  The insurer had retained an engineer to assess the cause of the damage and wrote a report concluding that the collapse was caused by a long-term condition not covered by the policy.  <u>Id.</u>  Judge Reed held that "[w]hether or not the defendants' expert correctly assessed the cause of damage, the plaintiffs have not presented evidence to substantiate their claim that [the insurer] acted unreasonably."  <u>Id.</u>

Here, Plaintiffs have not met their burden to establish bad faith by clear and convincing evidence, nor have they cited to any part of the record in support of their claim as required by Fed. R. Civ. P. 56.  Plaintiffs' boilerplate, conclusory allegations in the Complaint about Defendant's conduct are belied by the evidence.  Defendant thoroughly investigated Plaintiffs' claim and conducted no fewer than three inspections of Plaintiffs' property.  Exs. A, F.  For the first two inspections, Defendant sent its own representative; when Plaintiffs challenged the initial draft amount, Defendant retained an outside expert, Rainmasters, Inc., to conduct an additional inspection and prepare a new report.  Exs. A, C, D, F.  After Rainmasters, Inc. calculated a higher estimate of the damages, Defendant issued an additional check to Plaintiffs, totaling a net actual cash value payment of $5,677.23.  Ex. G.  Throughout the process, Defendant engaged in correspondence with Plaintiffs' representative.  As in <u>Collins</u>, summary judgment is appropriate because Plaintiffs have presented no evidence in support of their claim of bad faith.   The Court grants summary judgment to Defendant on Count II.

**VI.    Conclusion**

For the reasons discussed above, the Court grants Defendant's Motion for Summary

Judgment in its entirety.  An appropriate Order follows.

O:\CIVIL 09-10\10-4967 Enwereji v State Farm\MSJ Mem.wpd